IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**MARTIN S. GALLEGOS,**

      **Plaintiff,**

**vs.**                                                        **No.  02cv0116 JHG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Gallegos') Motion to Reverse and Remand for a Rehearing **[Doc. 16]**, filed October 4, 2002.  The Commissioner of Social Security issued a final decision denying Gallegos' application for supplemental security income.   Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Gallegos, now thirty-one years old, filed his application for supplemental security income on August 25, 1999, alleging disability since February 16, 1984, due to the amputation of his right forearm below the elbow, a burn injury to his left hand and the amputation of two of his left toes. Tr. 11. Gallegos has a tenth grade education and no past relevant work.  On August 22, 2001, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Gallegos' impairments were severe but did not singly or in combination meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1. The ALJ further found

Gallegos retained the residual functional capacity (RFC) for a restricted range of light work of an unskilled nature.  Tr. 14.  As to his credibility, the ALJ found Gallegos' testimony was not wholly credible. Tr. 15.  Gallegos filed a Request for Review of the decision by the Appeals Council.  On December 19, 2001, the Appeals Council denied Gallegos' request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Gallegos seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Gallegos makes the following arguments: (1) the ALJ erred in his RFC finding; and (2) the vocational expert (VE) testimony does not provide substantial evidence to support the denial of benefits.

The ALJ found Gallegos could perform a restricted range of light work of an unskilled nature. Tr. 14. In support of his RFC determination, the ALJ relied on several factors. First, the ALJ relied on Gallegos' past medical history stating, "Mr. Gallegos' condition has been stable for some time. He has not required ongoing medical treatment for his injuries as an adult, but he underwent a number of reconstructive surgeries as a child." Tr. 13. Additionally, the ALJ noted Dr. Davis' findings. Dr. Davis, the medical consultant and a Fellow of the American Academy of Disability Evaluating Physicians, evaluated Gallegos on August 28, 2000. Tr. 125. Relying on Dr. Davis' report, the ALJ found Gallegos had full range of motion in his shoulders and elbows, demonstrated good mobility in the neck and back, had intact hearing and speech, walked with a slight limp, had scarring of his left hand with some flexion contractures of the fourth and fifth fingers, lacked complete flexion of the fourth and fifth fingers when making a fist, lacked slight extension of the fourth and fifth fingers when he opened his hands, had intact sensory function, and had good range of motion of his hip and ankles. *Id.* The ALJ also considered Gallegos' testimony. Gallegos testified he took no medications, saw no physicians, could attend to his personal needs (could hold a knife, spoon, fork, razor, toothbrush, cigarette), occasionally went out, and occasionally helped with the housework. Gallegos also testified he had diminished standing, walking, and lifting abilities, had problems with his left hand and had problems with his balance. *Id.* However, the ALJ found Gallegos was not wholly credible and linked his finding to substantial evidence.

4

>The ALJ also relied on Social Security Ruling 83-12.  SSR 83-12 states in pertinent part:
>
>Loss of Use of an Upper Extremity
>
>A person who has lost the use of an arm or hand because of amputation, paralysis, etc., obviously cannot perform jobs which require use of both arms or both hands. Loss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability.  As stated in SSR 82-51, PPS-85, Guidelines for Residual Functional Capacity Assessment in Musculoskeletal and Cardiovascular Impairments, an amputation above the elbow would limit a person to light work activity with additional limitations because of loss of bimanual manipulation and difficulty or inability to handle bulky objects; effective use of the remaining hand may also be affected.  An amputation below the elbow– or partial loss of use of the extremity– will require a more detailed evaluation of functional ability, including the condition of the remaining stump and the person's ability to use a prosthesis–  or the person's remaining ability for fine and gross manipulating.
>
>Experience with persons who have lost the use of an upper extremity has shown that their potential occupational base is between the occupational bases for Table No. 1 (sedentary work) and Table No. 2 (light work).  While individuals with this impairment have been known to perform selected occupations at nearly all exertional levels, the total number of occupations within their RFC's is less than the number represented by a full or wide range of light work.  These individuals would generally not be expected to perform sedentary work because most unskilled sedentary jobs require good use of both hands.  Persons who have the least remaining function would have only the lower occupational base, while those who have the most remaining function would have some of the higher occupational base added in terms of numbers of jobs which can be performed with this type of impairment.  Given an individual's particular RFC, a VS will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country.

Social Security Ruling 83-12, 1983 WL 31253 at *4.  Gallegos contends the ALJ erred in his RFC finding because the "ALJ merely noted most of the consulting physicians' findings and conclusion and then announced his RFC finding."  Pl.'s Mem. in Supp. of Mot. to Remand at 4. As noted above, the ALJ considered more than Dr. Davis' findings.  Gallegos also contends the ALJ failed to mention that Dr. Davis found that his left wrist extension was limited to 20 degrees

and that his left hand scarring was "extensive." *Id.*  Finally, Gallegos contends the ALJ failed to mention that the DDS nonexamining physician "assessed occasional postural limitations with climbing, balancing, stooping, kneeling, crouching, crawling, and limitations with reaching in all directions, gross and fine manipulation and feeling." *Id.*

The DDS nonexamining physician completed a Physical Residual Functional Capacity Assessment form on September 7, 2000, and noted Gallegos had some postural limitations occasionally in the areas of climbing, balancing, stooping, kneeling, crouching, and crawling. Tr. 147.  The DDS physician also noted manipulative limitations in reaching all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors). Tr. 148.  Under this category, the DDS physician noted "R forearm amputation, normal L upper extremity." *Id.*

Dr. Davis' evaluation does not preclude frequent reaching, handling or fingering. Specifically, Dr. Davis reported "good mobility in the neck, mid back and the low back."  Tr. 126. Dr. Davis also reported "no pain with spinal movements and there was no spasm or deformity." *Id.*  Dr. Davis further found "full motion of the shoulders, elbows" and "good motion of the hips and ankles." *Id.*  Dr. Davis noted Gallegos had "some impairment of the left hand" and "may have some limitation with prolonged standing and walking, if he has foot discomfort." *Id.*  Dr. Davis also noted Gallegos' sensory functions were intact.  Tr. 126.

The opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved. See 20 C.F.R. § 404.1527(d)(5).  In this case, Dr. Davis' evaluation must be given more weight than the DDS nonexamining physician.

The ALJ also consulted with the VE who heard the testimony and had the opportunity to review the record. The ALJ asked the VE the following hypothetical question:

> If you were to consider an individual the age, educational background, and experience of claimant, and we were to consider that this individual is limited as follows: Accept (sic) he, he's a one armed individual. The other hand can be used for most functions, but not repetitively. This individual is limited to unskilled work, work that does not require a lot of reading or writing, can only understand simple instructions, things of that nature. With those limitations would the individual– would there be any jobs in the economy that you could, that an individual such as I described might do?

Tr. 42. The VE asked the ALJ whether there was any restriction on lifting. *Id.* The ALJ responded "the lifting would be about ten or 15 pounds with that, the good arm." *Id.* With that hypothetical, the VE opined it would have to be a selective placement, one that would have to be developed specifically for Gallegos rather than having him go out and competitively compete. Tr. 43. After the VE eliminated some positions requiring two hands and repetitive work, the ALJ asked the VE about a door greeter. The VE explained the position of door greeter was typically considered a temporary assignment rather than a permanent assignment. The ALJ also inquired about a parking lot attendant position. Tr. 44. The VE opined Gallegos would not have a problem in that position but asked for further clarification regarding Gallegos' ability to handle small objects like coins. *Id.* The ALJ expanded his hypothetical to include an individual capable of "most normal things with the hand, like hold a knife, a fork, a spoon, a razor, a toothbrush, things like that, but not, not able to do repetitive things with the hand, like something that requires a repetitive motion, and opening and closing, and stuff like that." *Id.* With this additional information, the VE opined Gallegos could perform the job of parking lot attendant which was classified as unskilled light. Tr. 45. The VE testified there were 800 parking lot attendant jobs in

7

the region and 80,000 nationally.  *Id.*  The VE further testified Gallegos could also perform the job of laundry sorter, also unskilled light with 600 in the region and 45,000 nationally.  *Id.*  The ALJ then asked the VE if Gallegos could perform gate guard work.  The VE opined the position was "a low end semi-skilled" job but added the job would be appropriate.  *Id.*     The job of parking lot attendant does not require climbing, balancing, stooping, kneeling, crouching, crawling or feeling.  *See Dictionary of Occupation Titles,* 915.473-010.  However, the job does require frequent reaching, handling, and fingering.  *Id.*  The job of laundry sorter does not require climbing, balancing, kneeling, crouching, crawling or feeling.  *See Dictionary of Occupation Titles*, 361.687-014.  The job requires occasionally stooping and fingering, and frequently reaching and handling.  *Id.*  The Commissioner concedes the job of gatekeeper is semi-skilled and thus not appropriate for Gallegos.

The Court does not find any conflict between what Gallegos can do and what these jobs require.  The ALJ specifically limited Gallegos from repetitive actions with his left hand which is supported by the record.  These jobs do not require repetitive actions.  As noted above, the Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's RFC determination and his finding of nondisability.

A judgment in accordance with this Memorandum Opinion will be entered.

JOE H. GALVAN
UNITED STATES MAGISTRATE JUDGE